# CASES DETERMINED

## *January Term, 1878.*

---

DELAPLAINE and another vs. TURNLEY and another.

CONTRACTS: BROKER: VARIANCE. *Effect of proving special contract for price of services under complaint for* quantum valebant. *When broker entitled to full commission as for a sale.*

Complaint on a *quantum meruit* for services rendered by plaintiffs at defendants' request, in taking charge of property, advertising it for sale, soliciting purchasers, and procuring proposals which were approved by defendants, drawing deeds, etc. Answer, a general denial. Proof on plaintiffs' part, of an offer made and accepted by letter, that, if successful in disposing of the property for defendants, their commission, including advertising, should be three per cent., and, if unsuccessful, they should be reimbursed actual cost of advertising and paid $25 per annum for caring for the property; and that they took charge of the property for some months, advertised it for sale, and procured a proposal for exchange, which was at first accepted by defendants, who afterwards, without apparent cause, rejected it and sold it to another person. *Held,*

(1) That plaintiffs were at least entitled, upon this evidence, to recover the actual cost of advertising, and compensation at the rate of $25 per annum.

(2) That there was no such *variance* between allegations and proofs as to justify a nonsuit; the evidence not having been objected to on that ground, and defendants not appearing to have been misled to their injury.

(3) That where a broker, employed to sell property at a price satisfactory to his principal, produces a party ready to make the purchase at a satisfactory price, or to make an exchange satisfactory to the principal, the latter cannot relieve himself from liability to the broker for a commission by a capricious refusal to consummate the sale; and upon the evi-

dence in this case it should have been submitted to the jury to determine whether plaintiffs were not entitled to their full commission as for a sale.

[RYAN, C. J., in a separate opinion, discusses the effect, in various circumstances, of proof of a specific contract for services under a declaration for *quantum valebant*.]

APPEAL from the Circuit Court for *Dane* County.

Action by *Delaplaine* and *Burdick* against *P. T. Turnley and wife*, to recover $200 for certain services rendered by plaintiffs at defendants' request, between about the 1st of March and the 1st of November, 1876, in taking charge of real property in Madison, in this state, advertising it for sale, soliciting purchasers, procuring from one Parker proposals for an exchange, which were approved by the defendants, drawing deeds, etc. The complaint alleges that these services were reasonably worth the sum above named. The answer was a general denial.

The evidence for the plaintiffs tended to show the following facts: The defendants were residents of Chicago. The property in question belonged to *Mrs. Turnley*, but her husband was her authorized agent to manage and dispose of it. On the 15th of March, 1876, *Mr. Turnley* wrote to the plaintiffs (who were real estate agents at Madison), asking them to inform him at what price the property could be sold that spring, the purchaser assuming an incumbrance upon it (of $3,000, due in January, 1880, with interest at seven per cent.), and to have three, five, six or even eight years to pay the balance, with interest at six per cent. On the 22d of March, replying to two intermediate letters of the plaintiffs, he states that he offers the property, until the first of April, at $7,000, including the amount of the incumbrance above described. On the 25th of March, plaintiffs wrote to *Mr. Turnley* as follows: "If you think proper to place your property in our hands, we will  *  *  see to any necessary repairs and payment of taxes, and place the property on sale, judiciously publishing it by a method we have hitherto found effective. If we dis-

pose of it, our charge, including advertising, will be three per cent., or say $200. If unsuccessful, we shall expect to be re-imbursed for only actual advertising, and the sum of $25 per annum for our services in caring for the property." On the 7th of April, *Mr. Turnley* replied, stating that two par-ties had been writing to him, one to, purchase the property in question, the other to exchange unimproved city property for it, but that they were slow and uncertain in their offers. He then authorized plaintiffs to place the property at once on their books for sale on the following terms: The purchaser to as-sume the incumbrance above described, and pay $1,500 cash, and $3,000 in equal annual payments of not less than $500, with interest at six per cent.; this offer to remain until the 1st of June. In the meantime he reserved the privilege of ac-cepting the offer of either of the parties above mentioned, but in that case agreed to pay the plaintiffs for their advertising and their "rate per annum for care of the property." Plaint-iffs immediately proceeded to advertise the property by means of printed circulars distributed by them through the post-office, and took other means to effect a sale or exchange. Dur-ing the months of May and June, negotiations were taking place concerning an exchange of defendants' property for lots in the city of Chicago belonging to a person not named, who was represented in the negotiations by Mr. Morey, a real es-tate agent in that city; and *Mr. Delaplaine* visited Chicago, examined the lots offered by Mr. Morey, and reported to *Mr. Turnley* his estimate of their value; but the negotiations failed. During the month of July, plaintiffs made repeated efforts to obtain a reduction of the assessment of defendants' property for taxation for that year, and succeeded in reducing it from $7,000 to $6,500. During the month of August, some correspondence took place between plaintiffs and *Mr. Turnley*, in reference to offers to *rent* defendants' property. On the 9th of September, plaintiffs wrote to *Mr. Turnley*, stating that they had that day shown his place to a Mr.

Parker, who desired to exchange lots 9 and 12, block 5, corner of Michigan avenue and 61st street, Chicago, " being 198 feet on the avenue, and 170 feet deep." They further stated that Mr. Parker estimated his said lots to be worth " from $60 to $75 per foot, avenue front; " that there were certain described mortgage incumbrances upon it amounting to $3,800, with interest at ten per cent.; and that Parker intimated that he would exchange these lots for defendants' house, " each taking the property subject to the incumbrances as stated." On the 14th of the same month, *Mr. Turnley* replied that he wished to see Mr. Parker's lots and surroundings; that nothing had any cash value then, there or elsewhere; that $40 cash per foot would buy such lots by the thousand; but that still they might make a trade. Four days later, he wrote to plaintiffs that he had seen and examined Parker's lots; that he considered the property just as valuable as the best property adjacent; that all the adjacent property was in the market at $40 per front foot on Michigan avenue; and that, while waiting for Parker's more definite offer, his wife and he desired to say that they would prefer to take $3,500 for their " equity " in the Madison property. On the next day, plaintiffs wrote to *Mr. Turnley*, quoting a letter received by them from Mr. Parker, in which the latter stated that he thought he would give an even exchange of his " equity " in the Chicago lots, for the defendants' house and lot in question, subject to the incumbrance of $3,000, but that he would not pay any commission. On the 25th of the same month, plaintiffs wrote to *Mr. Turnley* as follows: " Mr. Parker writes us that he shall be in Madison soon, and will then call in relation to the exchange. Shall we accept for you his proposition, with the proviso that everything pertaining to his property is straight?" Two days later, *Mr. Turnley* answered as follows: " You can close trade with Parker as per offer, viz.: Even swap of properties, each assuming all care and responsibility of the incumbrance on what he gets, and each settling to date, or balanc-

ing the same with the other, all interest due, and also paying the taxes respectively for 1875. This we suppose to be his offer, and the same is accepted. *   * He can keep his lots here, and pay us $3,000 cash for the equity in ours." On the 28th of September, plaintiffs wrote to *Mr. Turnley:* " Mr. Parker was here this morning, and proposes to exchange property, each taking the other's subject to the incumbrances, save that accrued interest is to be adjusted up to date of exchange, and each to clear the property of all claims save the incumbrances as stated." They then designated the place where Mr. Parker's abstract of title could be seen in Chicago. On the next day, they wrote: " We expect another visit, on to-morrow, from Mr. Parker, and regard the exchange of properties as agreed upon, but will try him on a cash basis." On the 30th, *Mr. Turnley* wrote to the plaintiffs: " I will call Monday for Parker's abstract, and will forward you abstract and deed of Madison property as soon as you will tell me full name and residence to insert as grantee. Let Parker deed to me."

It appears from a postscript to this letter, and from plaintiffs' reply thereto, that *Mr. Turnley* in fact forwarded his abstract to the plaintiffs in said letter. On the 2d of October, plaintiffs wrote to *Mr. Turnley:* " Mr. Parker is here this morning, and mentions now, what we heard nothing of before, that there is an assessment for the South Park, payable in annual installments, all of which that are due he proposes to discharge, but to except in his conveyance to you the incumbrance for the Park purposes, as well as the mortgages. * * * This may be all plain to you, and the Park assessment stand in the same light as annual taxes, and a proper future charge upon the land. *   *   * If you are satisfied with the title with this exception from his covenants, please send us deed [here they state the name and residence of Mr. Parker as the same are to be inserted in the deed to him of the Madison property]." On the next day, October 3d, *Mr. Turnley*

wrote to plaintiffs: "I presume Parker is right about the Park taxes. He, of course, will have paid up all annual payments, to include 1875, leaving me to pay future annual payments. That is to say, he excepts the remaining annual payments, which leaves me to pay the same as they fall due." The next day *Mr. Turnley* sent the plaintiffs a draft of a deed from his wife and himself to Mrs. Parker, of the Madison property, requesting plaintiffs to make certain insertions therein in accordance with the records, and return the deed to him for execution and acknowledgment, and also requesting that plaintiffs or Parker should prepare the deed which was to be executed by the latter and his wife. On the 7th of October, plaintiffs wrote to *Mr. Turnley*, returning to him the first-mentioned deed with the desired insertions, and a memorandum of what appeared to them to be a defect in the description therein of the premises conveyed. On the 13th, *Mr. Turnley* answered, stating in substance that another draft of said deed had been written at once upon receipt of the foregoing letter and enclosure; that its execution, etc., before the commissioner had been delayed by *Mrs. Turnley's* sickness; but that it would be attended to the next day. He added: "What does Parker say to the $3,000 cash offer?" On the 16th, plaintiffs suggested to *Mr. Turnley*, by letter, that he had better himself fill out the blank deed for Mr. Parker to execute, as they were "not sure of the proper description of either the land or the incumbrances to be mentioned in the reservation as to warranty." They added a request that the deed, when so prepared, should be forwarded to them, and stated that they would have it executed (by Parker and wife), and returned to Parker's agent in Madison, so that the transaction could be concluded as soon as the *Turnley* deed should be received. They further added: "We have little doubt that it is better to have the deeds here ready for delivery before we make cash proposition to Mr. Parker." On the 20th of October, *Mr. Turnley* wrote to plaintiffs:

"Inclosed is draft of deed, Parker to *Turnley*, which, so far as I see, covers all requisite points. Can't see why except Park taxes, any more than any other taxes; hence I leave that alone, as for other taxes." He added: "My daughter has just brought to my notice a remark in yours of September 19th, wherein Parker seems to have said about as follows: 'Now understand me, I will give an even exchange, but no commission.' Hence (as I had failed to have this remark in mind), I am now led to request you to let us know just what commission devolves upon us in case of consummating the trade as he has proposed. Please do this before proceeding further." Plaintiffs answered the next day, referring him to the terms mentioned in their letter of March 25th. *Mr. Turnley* replied, October 23d: "Of course I had your rate of commission for selling, in yours of 25th of March last, namely, three per cent. The effect of my inquiries of 20th inst. is, to learn on what amount of money, in case of this trade, I shall have to pay three per cent; or, to place it in the form of an account: 'To amount of commission on $——, at 3 per cent., $——.' 'For exchanging property with J. W. Parker, $——.'" He added in a postscript: "You are authorized to offer and sell all the equity in that property, until further notice, at $2,000 cash." On the 26th of October, plaintiffs answered: "In this case we should estimate commission thus: Value of the mortgage assumed, $3,000; consideration of conveyance, $3,000; total, $6,000 — on which we should expect to receive three per cent." They further said: "Mr. Parker has returned to his agent here the deed drawn under your direction, but with an addition to the covenant to pay the notes and mortgages, 'his heirs,' and 'interest' — changing the depth from 187 to 170 feet, which his agent explains as being caused by the widening of the avenue from 66 to 100 feet; also the following: 'In executing the within instrument, the parties of the first part do hereby except all installments of taxes assessed against the above described lot or parcel of

land for benefits resulting thereto by reason of the location of South Park, with accrued interest.' * * * On being notified that your deed is here, Mr. Parker will come and attend to the exchange of conveyances, when we will put your cash offer to him." On the next day (October 27th), *Mr. Turnley* replied: "We decline to further entertain Mr. Parker's offer in the case; but we are perfectly well satisfied with all your actions and suggestions in the case. On reviewing our own interests and condition of affairs, we conclude to ask you to withdraw it from the market. * * * You may still give our offer of September 27th to Mr. Parker — our equity for $3,000 cash. . Our later one, for $2,000, we withdraw." After some further correspondence, *Mr. Turnley* wrote to plaintiffs on the 24th of November, asking them to send him their " bill for care, etc., of the property to date;" and the plaintiffs answered on the 27th, that their charge for services to date was " the same as though the exchange with Mr. Parker had been perfected, * * * viz., $180;" that this amount would "pay for services, and in case any further labor should be required for the year ending April 1, 1877," would also pay for such labor. *Mr. Turnley* replied the next day (October 28th): "Your charge of $180 for care, etc., of property, I will not pay. I am willing to pay you as per contract and agreement set forth in your letter of March 25th."

It appeared further from the evidence, that some time in the summer of 1876, a Mr. Ford offered the plaintiffs a price for the *Turnley* property, which they thought too low; that subsequently Mr. Ford told plaintiffs he was prepared to make a definite offer, and they replied that the property had been sold or bargained, and the papers were then drawing, and he was too late; and that the property was in fact sold to Mr. Ford by the *Turnleys*, and conveyed to him by deed dated and acknowledged December 1, 1876, in which the consideration expressed was $4,500.

One of the plaintiffs testified as to the amount of labor

performed by them in caring for and endeavoring to sell or exchange the property, and that it was worth $200.

The circuit court, on defendants' motion, rendered a judgment of nonsuit and for costs against the plaintiffs; from which they appealed.

*J. H. Carpenter*, for the appellants, argued, 1. That they were entitled at least to recover something for the work performed, and that no question could properly have arisen on the motion for a nonsuit, as to *how much* they were entitled to recover. 2. That it was plain, from the evidence, that the Parker trade was broken off to avoid payment of plaintiffs' commission, and with a view also to a secret negotiation by defendants themselves with Ford, a customer found by the plaintiffs; that, as defendants alone prevented the Parker trade, and that unreasonably, plaintiffs were entitled to recover as though that sale had been consummated. *Higgins v. Moore*, 34 N. Y., 417; *Knapp v. Wallace*, 41 id., 477; *Mooney v. Elder*, 56 id., 238; *Glentworth v. Luther*, 21 Barb., 145; *Love v. Miller*, 53 Ind., 294; *Lane v. Albright*, 49 id., 275; *Cook v. Fiske*, 12 Gray, 491; *Reed's Executors v. Reed*, 82 Pa. St., 420; *Keys v. Johnson*, 68 id., 42; *Edwards v. Goldsmith*, 16 id., 43.

For the respondents, a brief was filed by *Vilas & Bryant*, and there was oral argument by *Wm. F. Vilas*. They contended, 1. That under the written contract of March 25th, defendants were indebted to the plaintiffs only for the actual cost of advertising, and compensation for care, etc., of the property, at the rate of $25 a year. It was first held in this state, that, to entitle a broker to his commissions upon a sale, there must be a sale, and he takes the risk that his principal will execute according to the terms authorized by him. *Power v. Kane*, 5 Wis., 265; and see also *Broad v. Thomas*, 7 Bing., 99; *Read v. Rann*, 10 Barn. & Cress., 438. This doctrine has perhaps been modified to the extent that where the broker has fully met his contract, and nothing but the capricious

refusal of his principal, or his voluntarily disabling himself from performance, prevents the consummation of the sale, the broker is entitled to his commission. *Stewart v. Mather*, 32 Wis., 344; *Kock v. Emmerling*, 22 How., U. S., 69; *Moses v. Bierling*, 31 N. Y., 462. But this cannot be carried so far as to enable the broker to impose on his principal distasteful terms of exchange, partially negotiated and different from those mentioned in his engagement, and entitle him to commission when his principal refuses. The broker must show that his contract with his principal was met by the proffered action of the supposed purchaser. *Moses v. Bierling, supra*; *McGavock v. Woodlief*, 20 How., U. S., 221; *Moffatt v. Laurie*, 15 C. B. (80 E. C. L.), 583. The contract between these parties did not contemplate an exchange of defendants' real estate for other like property, but a sale. Plaintiffs were to have a commission if a sale were made; if not, then a different specified compensation. But even if the exchange with Parker would have entitled plaintiffs to a commission as for a sale, that exchange was never effected; because, as the evidence shows, the minds of the parties never really met, the proposition to which defendants assented being materially different from the proposed performance by Parker, which they rejected. When plaintiffs undertook to accomplish a modification of the terms with which they had contracted to earn their commission, by endeavoring to effect an agreement to exchange instead of a sale, they took the risk of successfully negotiating such an agreement as should be mutually binding on the parties. *Hamond v. Holiday*, 1 C. & P., 384; *McGavock v. Woodlief, supra.* 2. That, the action being brought not upon the contract but upon a *quantum meruit*, the complaint containing not only no allegation of any contract, but none of the time of service and cost of advertising, and no attempt having been made to amend the complaint, plaintiffs could not recover under it the contract price to which they are entitled for their services in the care of the property

Delaplaine and another vs. Turnley and another.

This court has repeatedly held plaintiffs to the theory upon which they have sued, refusing even slight amendments leading to a distinct change of the ground of action (*Newton v. Allis*, 12 Wis., 378; *Larkin v. Noonan*, 19 id., 82; *Stevens v. Brooks*, 23 id., 196); and the doctrine should be even more rigidly applied to a party who did not ask to amend.

COLE, J. We think the nonsuit in this case was improperly granted. It is not necessary now positively to decide whether or not the plaintiffs could recover their commissions on the trade made with Parker; but surely they were entitled to recover something for their services in taking charge of the property, looking after it, and advertising it for sale. The correspondence shows that they were to be paid the actual expenses of advertising, and at the rate of $25 per annum for services in caring for the property, even if no sale was effected. And we can see no difficulty in the way of their recovering on that claim under the complaint. It is suggested that the action is upon a special contract, and that the plaintiffs were not entitled to recover upon a *quantum meruit*, under the complaint. We do not think this position well taken. The complaint states fully the facts constituting the cause of action.

We are inclined to think, also, that a jury might properly have found, upon the evidence, that the plaintiffs were entitled to recover the commissions claimed. But this question is purposely left undecided until the defendants produce their evidence. The rule of law, as laid down by this court, applicable to this class of cases is, " that a broker employed to make a sale at a price satisfactory to the seller, is entitled to his commissions when he produces a party who makes the purchase. And it is in general enough, in such a case, that the broker produces a party ready to make the purchase at a satisfactory price; and the principal cannot relieve himself from his liability by capricious refusal to consummate the sale, or

by a voluntary act of his own disabling him from perform-
ance." Dixon, C. J., in *Stewart v. Mather*, 32 Wis., 344–349.
Did the plaintiffs bring themselves within this rule? There
was evidence sufficient to go to the jury upon that question.
True, the sale to Parker was not consummated; but was the
trade broken off or prevented by the misconduct of the de-
fendants? The case should have gone to the jury upon this
or the other question, at least.

The judgment of the circuit court must be reversed, and
the cause remanded for a new trial.

Ryan, C. J.   I. Where a contract for service fixes the price
of it, it is doubtless a technical variance to declare for the ser-
vice *quantum valebat*. When the contract is a formal one, an
amendment might be necessary.   But practice, under the
code, is very liberal in respect of variance where the contract
is not formal or written, resting loosely in conversation or
correspondence. *Prima facie*, the price fixed by the parties
is a fair one, *quantum valebat;* and evidence of the agree-
ment might be held *prima facie* proof of the *quantum val-
ebat* pleaded. In such a case the plaintiff might lose his right
to recover the full compensation stipulated, upon the defend-
ant's proving the service to be worth less.   He might be held
to have waived his absolute right to recover the agreed price
by tendering an issue of the value of the service.   On the
other hand, if the plaintiff should undertake to prove a
higher value, the defendant could limit the right to recover by
proof of the agreed price.

The contract here was equally within the knowledge of both
parties; and if the defendants had made, and desired to avail
themselves of, a tender, there was no difficulty in their plead-
ing the contract price, their view of the extent of service ren-
dered, and the tender.

Independently of secs. 33 and 34, ch. 125, R. S., I should
doubt whether, under the code, in an action on a contract so

made, such a variance between *allegata* and *probata* would support a nonsuit.

But those sections appear to me to put the question beyond doubt. The first of them provides that a variance shall not be deemed material unless it be made to appear that it has actually misled the adverse party to his prejudice. And the second provides, in effect, that when the variance is not so material, the court shall disregard it, with or without amendment. The rule under these sections goes far beyond the necessity of this case. *Fox R. V. Railroad Co. v. Shoyer*, 7 Wis., 365; *Fisk v. Tank*, 12 id., 276; *Bonner v. Insurance Co.*, 13 id., 677; *Gardinier v. Kellogg*, 14 id., 605; *Danley v. Williams*, 16 id., 581; *Fery v. Pfeiffer*, 18 id., 510; *Muzzy v. Ledlie*, 23 id., 445; *Hazleton v. Union Bank*, 32 id., 34. See also *Eastman v. Bennett*, 6 Wis., 232, before the code.

There is the less difficulty in so holding in this case, because the objection does not appear to have been specifically taken below, so as to put the appellants to their motion for leave to amend.

II. On the merits, there certainly appears to have been a case for the jury.

If the respondents consented to an exchange of properties, instead of a sale for money, it is difficult to understand why they should be heard to contend that such an exchange would not entitle the appellants to compensation.

There is evidence tending to show that the respondents accepted a proposition to exchange properties negotiated by the appellants. The respondents appear afterwards to have refused the exchange, of their mere will, without reason assigned. They probably thought it for their interest. And, as against the other party to the exchange, they may have had a right to do so. But having once accepted the proposition, which they afterwards rejected without fault of the appellants, respondents could not arbitrarily do so, so as to deprive the

appellants of their compensation for the agreement negotiated by them.

Certain objections are urged here to the conveyance offered to the appellants upon the proposed exchange. It is sufficient to say here that these objections are not taken in the letter of the appellants refusing to consummate the exchange.

It is not said that the appellants had a right to recover. It is only said that there was evidence to go to the jury on which they might recover. On this point the nonsuit was clearly wrong.

For these reasons I concur in the judgment of this appeal.

*By the Court* — Judgment reversed, and cause remanded for a new trial.

LYON, J., took no part in the decision of this cause.